1 | LAW OFFICES OF MICHAEL S. OVERING, APC
2 | Michael S. Overing, Esq. (143858)
  | Edward C. Wilde, Esq. (144809)
3 | Itzel Morales, Esq. (331815)
  | Tiffany R. Gutierrez, (350468)
4 | 790 E. Colorado Blvd., Suite 320
  | Pasadena, CA 91101
5 | Tel:    (626) 564-8600
  | Fax:    (626) 577-9400
6 |
7 | Attorneys for Defendant, Ron Thorn

8

**CENTRAL DISTRICT COURT FOR CALIFORNIA**

9

**SOUTHERN DIVISION**

10

11 | RON THORN, an individual

12 |                                          Plaintiff

13 | v.

14 |

15 | AMANDA PETERS, an individual;

16 | FLIPFLOPSINTHEPIT, an individual;

17 | RENTTREZNOT, an individual; and DOES 1-8,

18 | inclusive

19 |                                          Defendants.

20
21
22
23
24
25
26
27
28

Case No.: 8:24-cv-02213

**COMPLAINT FOR: COPYRIGHT INFRINGEMENT; SLANDER and LIBEL AND FOR PUNITIVE DAMAGES**

UNLIMITED JURISDICTION

DEMAND FOR JURY TRIAL

**Complaint Served:**

**Response Date:**

COMPLAINT FOR PUNITIVE DAMAGES

Plaintiff Ron Thorn alleges the following complaint:

1. This court has original subject matter jurisdiction over the copyright infringement claim under 17 U.S.C. § 501, *et seq.*, and 28 U.S.C. §§ 1338(a).  LR 8.1 FRCP 10.  Venue in this district is proper under 28 U.S.C. § 1391(b) in that Defendant resides in this district. As will set forth below, the infringement which took place entails a video which was posted on YouTube.com. Plaintiff is informed and believes and based upon such information and belief alleges that the video was recorded in this district. Accordingly, the appropriate venue for this action is the Central District of California.  This court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S. Code § 1367 (a).

2. Ron Thorn (hereinafter "Plaintiff") is an individual who at all times herein relevant resides in the State of California. He has established a substantial reputation for designing and building custom guitars. His work is exhibited online at Thornguitars.com. His reputation was such that he was hired by "Fender Guitars" (Fender Musical Instruments Corporation, hereinafter "Fender") to be the chief designer of guitars.

3. Plaintiff is informed and believes and based upon such information and belief alleges Defendant Amanda Peters (hereinafter "Peters) is an individual who currently lives within the area of the Central District of California for the 9th Circuit.

4. At all times relevant hereto, Plaintiff has been and still is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et. seq.*, and all amendments thereto) (the "Copyright Act") to reproduce, distribute, display, or license the reproduction, distribution, and/or display of his photograph, attached hereto as exhibit A, which is the subject of this action (hereinafter referred to as the "photograph") throughout the United States. The copyright registration for the photograph is attached hereto as exhibit B.

5. As will be set forth hereinbelow, Defendant Peters infringed upon Plaintiff's copyright in the photograph.

6. Prior to the time Plaintiff was hired by Fender, he had established a reputation as a designer of guitars. There were a dozen persons working at Fender who were designated as "Master Builders". Plaintiff was hired as a person over the other Master Builders. Unknown to Plaintiff, his hiring by Fender apparently caused discontentment with at least one person who also was designated as a Master Builder at Fender. Plaintiff is informed and believes and based upon such information and belief alleges Peters currently resides with one such disgruntled Fender employee. Plaintiff is informed and believes, and based upon such information and belief, alleges that such disgruntled Fender employee encouraged Peters in making the defamatory statements as alleged herein and seeking Plaintiff's loss of employment. Thorn is not alleging any claim against the disgruntled Fender employee. This complaint concerns the actions of Peters and the actions of Peters, alone. Plaintiff does not allege any wrongful conduct on the basis of any communication Peters made to any governmental agency or within the scope of prosecuting her state court action. This complaint concerns Peters' act of copyright infringement, and Peters' defamatory communications made independently and of and/or outside of her institution and prosecution of the action she has instituted in state court in California. No action is alleged herein against the attorneys representing Peters in her lawsuit instituted in the state court of California. This lawsuit will not be amended to concern allegations against Fender or Peters' attorneys in the state court action.

7. As will be alleged further below, there were extensive electronic communications involving text and often images. Thorn can recall the fact of such communications and the content of some such communications as will be alleged hereinbelow. He was sad and ashamed that he even opened up a friendship with her. Peters claims to have no documentation to support any of her claims made against Thorn. Fortunately for Thorn, a friend of his, a luthier who lives in Spain named Maria has provided screenshots of such communications. (Thorn understands there were other such communications with other third parties. Such will be provided when they have been confirmed and

when there is demonstrable evidence of such communications.) The luthier named Maria Serrano (hereinafter "Serrano") kept and forwarded her extensive correspondence with Peters. Peters admitted she had no evidence of the allegedly wrongful things done by Thorn. The text messages between Serrano and Peters are the source for much of the physical evidence supplied by Thorn hereinbelow.

8. Defendant "FlipFlopsinthePit" is an individual whose true name is unknown, but Plaintiff is informed and believes, and based upon such information and belief, alleges it is Amanda Peters. Plaintiff intends to conduct discovery to ascertain the true identity of "FlipFlopsinthePit".

9. Defendant "RentTreznot" is an individual whose true name is unknown, but Plaintiff is informed and believes, and based upon such information and belief, alleges it is Amanda Peters. Plaintiff intends to conduct discovery to ascertain the true identity of the "RentTreznot".

10. The true name(s) of the Doe Defendants are unknown to Plaintiff and are accordingly herein named as Does 1-8.  When Plaintiff learns the true name of such Doe Defendants they will be substituted herein under such true names. Plaintiff is informed and believes, and based upon such information and belief, alleges that each such Doe Defendants acted as an agent, joint venture, employee, co-conspirator of each the other and/or were otherwise jointly and severally liable for the wrongful acts herein alleged.

11. Plaintiff Ron Thorn has been involved with the crafting and manufacture of custom electric guitars for nearly 30 years. In that time, he has developed an excellent reputation for the design and construction of the instruments. In the decade of the 1990s he began working with Fender guitar as an outside vendor. He also builds guitars under his own name.

12. Thorn's business reputation became such that in 2018 he was hired by Fender to the position of Principal Master Builder. The position was created especially for him. Fender had used the position

1  of Master Builder since 1987. At the time he was hired by Fender, Fender had in place certain

2  persons who worked under the designation of Master Builder and Sr. Master Builder. The position

3  created for Plaintiff, Principal Master Builder, was a salary position above any other person

4  designated as "Master Builder." It must be noted that Plaintiff's public reputation is as a guitar

5  designer and builder. Were it not for his work performed in connection with building guitars,

6  Plaintiff would not be well-known, beyond his immediate friends and family. Hence, any damage

7  done to his reputation is damage done to his reputation in connection with his pubic status as a

8  luthier. Plaintiff is not contending that his family believes the malicious falsehoods of Peters.

9  However, allegations that plaintiff has engaged in harmful sexual conduct will cause damage to his

10 *public reputation* because the artistic work as a craftsman is bound up with his public persona, as is

11 often demonstrated when the work of an artist is shunned, an actor loses a role, etc., which follows

12 when an accusation (whether true or false) of conduct not directly tied to their public reputation is

13 made. Examples include such as Kevin Spacey (found not guilty:

14 https://www.bbc.co.uk/news/live/uk-66291461) being replaced in the movie "All the Money in the

15 World" (https://time.com/5040695/ridley-scott-kevin-spacey-all-the-money-in-the-world/); baseball

16 pitcher Trevor Bauer being banned from baseball (restraining order rejected,

17 https://www.si.com/fannation/mlb/fastball/news/former-cy-young-trevor-bauer-speaks-out-after-

18 settling-lawsuit-tied-to-assault-allegations), Bill Cosby's TV show cancelled in the wake of charges

19 (https://www.pbs.org/newshour/nation/nbc-cancels-bill-cosby-project-wake-sexual-assault-

20 allegations) which were later overturned

21 https://www.pbs.org/newshour/arts/why-bill-cosbys-conviction-was-overturned). Making

22 accusations of conduct not directly tied to their profession (acting, athletics) damages the trade

23 reputation of even the most highly respected members of a profession. Numerous other examples

24 could be provided.

25

26 13. In early 2020, his marriage was under a great deal of strain. At that time, he physically separated

27 from his wife while remaining legally married. He rented a room from a fellow Fender employee.

28

He would return to his own house over the weekends to do laundry and to help maintain the residence.

14. In March 2020, Plaintiff was promoted to the position of Director of Master Builder Operations.

15. Peters, according to her resume (attached hereto as exhibit "C" is a true and correct copy of the document she delivered to Plaintiff which named as her resume), Peters worked in Michigan until March 2020. In March 2020, she worked for one month as a "painter" for Alleva Coppolo a guitar builder in Upland, CA. According to her resume, she only kept that job for one month and returned to work in a restaurant in Michigan.

16. Plaintiff understands that somewhere around this time (March 2020), Defendant met Dave Nichols, a Master Builder for Fender. Defendant then began to "follow" Plaintiff on Instagram. She claims that she began to "follow" other, perhaps all, of the Fender Master Builders. As is his custom, when followed on Instagram Plaintiff will return-follow those persons involved in the area of artistic work, and entertainment. He also follows his family members on Instagram. In texts to Maria Serrano, Peters showed pictures of family members whom she claimed Thorn was allegedly following for some improper purpose. Copies of those texts are not attached to this complaint so as to protect his family members from connection to Peters' conduct. Peters' accusations of Thorn following "underage" women concern Thorn following, his family members, and is not improper under any standard.

17. Defendant Peters contacted Plaintiff through the direct messaging application of Instagram. Plaintiff responded and Defendant struck up continued communication. Since she professed an interest in musicians and guitar building, there was a basis for conversation. At that time, she claimed that her "job" involved taking the negatives and slides which had been created by her uncle, apparently a rock'n'roll photographer, decades earlier and selling either the rights to such photographic images or selling reproduction of the prints. Defendant furthered the relationship by

sending six poster size prints of unpublished photographs of the rock band Queen taken in approximately 1980. She also sent him other photographs, such as candy, candles, and tea.

18. Amanda Peters then began to use the running joke from the TV show The Office, "That's what she said."

19. She escalated further, when she sent a professionally produced cassette tape which included various songs, such as the KISS song, "I Was Made for Loving You." The "mix tape" was accompanied by a cassette player.

20. In January 2021, Fender leadership requested the Master Builders to post on their social media accounts, "Fender is Hiring" and also the email for the hiring department at Fender.  Plaintiff received over 1200 "likes" on his Instagram page in response to this post. He responded encouraging everyone who contacted him about this post to send in their resume. Plaintiff was not involved in hiring and could only encourage resumes.

21. Defendant (screen name: msdetroit_) replied to Plaintiff's post of the Fender corporate message with 4 "crying sad face" emojis and "I want to join. I want to go there."

22. There were multiple times that Fender encouraged the Master Builders to promote Fender hiring. Fender supplied official graphics to use. Fender ran on-site job fairs and other events and encouraged Plaintiff and other Master Builders to be present at such job fairs.

23. In approximately April 2021, Master Builder Jason Smith contacted Defendant telling her she should seriously consider applying for a job at Fender and he sent her the link to apply. Thereafter, Defendant wrote Master Builder Dave Nichols to tell him she applied.
> Dave replied, "I heard"
> Defendant asked, "Did Ron [Plaintiff] tell you?"
> Dave answered, "No I think Nino told me"

1

Defendant wrote, "Oh! I told Nino a few days ago! I told them I can't move until the first week of July but they said they'd take me."

2

3    Amanda also messaged Plaintiff that she had applied. He asked what position, she answered,

4    "Specialty painter." She also said that Jason Smith was the one who told her to apply. Plaintiff

5    understands that Fender has no evidence that Peters ever applied for any position. The unreality is

6    not unexpected for one, such as defendant Peters, who suffers from Borderline Personality Disorder

7    ("BPD"). A person with BPD may exhibit "quasi-psychotic cognitions.' (Charles M Lepkowsky.

8    Borderline Personality Disorder. Nova Medicine and Health, 2020) Such confabulation is common

9    for those diagnosed with Borderline Personality Disorder. (See, e.g., Differential Cognitive

10   Disturbances in Three Types of Borderline Patients, Journal of Personality Disorders,

11   https://guilfordjournals.com/doi/abs/10.1521/pedi.1988.2.3.198      ;    Motivated    confabulation,

12   Neurocase,  https://www.tandfonline.com/doi/abs/10.1080/13554799608402406;  numerous  other

13   instances of reported confabulation could be provided). Confabulation is a false statement made by

14   one whose psychiatric condition results in the speaker not knowing the truth. BPD is one of many

15   psychiatric conditions which can give rise to confabulation. Such persons say untrue things while

16   believing them to be true. For example, "In an attempt to compensate for the yawning gaps in

17   memory, narcissists and psychopaths confabulate: They invent plausible "plug ins" and scenarios of

18   how things might, could, or should have plausibly occurred. To outsiders, these fictional stopgaps

19   appear as lies. But the narcissist fervently believes in their reality." (Vaknin, Sam. 2020.

20   "Dissociation and Confabulation in Narcissistic Disorders." *Addiction & Addictive Disorders* 7, no.

21   2 (May): 1–10. https://doi.org/10.24966/aad-7276/1000391 ; see, also, Biberdzic, M., Tan, J. & Day,

22   N.J.S. "It's not you, it's me": identity disturbance as the main contributor to interpersonal problems

     in pathological narcissism. (https://doi.org/10.1186/s40479-022-00209-6)

23

24   24. The Fender employment position was a manufacturing, production job; not a graphic designer.

25   The painters at Fender wear a full body suit and helmet with forced air supplied into it and they pull

26   the trigger on spray guns all day long shooting gallons of sealer, color and topcoat. When he heard

27   this, Plaintiff was curious as to whether Peters had ever done such work. In other correspondence,

28   she made remarkably untruthful statements concerning her "career." Her delusions about herself, at

1  least her willing to make statements were untrue are evidence by her claim to Serrano that she was

2  then helping Sir Brian May, former guitar player for Queen, build a guitar. She one time wrote, "I

3  literally work with Queen [the world renowned rock n roll act]." Plaintiff Thorn is unaware of any

4  evidence that this is true. Her Linkedin page shows no evidence that she ever worked with either

5  Brian May or the late-act Queen.

6

7  25. Sometime later, Plaintiff mentioned the conversation to Dave Nichols. Peters apparently had

8  told him that she used to work for "Fausto" a man who worked at Alleva Coppolo. (In a text

9  message, she made this claim.) Dave Nichols had no knowledge of this and had not seen her resume

10 at this time. When Plaintiff asked her about this, she said was not supposed to say that she had

11 worked there. So, Plaintiff asked for her resume.  He wanted to know what other experience she

12 had. Fender was offering a $1000 referral bonus to anyone that recommended someone that ended

13 up working at Fender for a minimum of 6 months. Plaintiff wanted to make some extra money.

14

15 26. In April 2021, Peters messaged back and forth with Dave Nichols. She told Dave Nichols,

16 "without you or Jimmy I don't think I would have believed in myself enough to apply."  Dave wrote

17 back, "You have the passion to do it, I'm glad we were able to push you into believing in yourself."

18 Amanda Peters also wrote to Dave Nichols, that she would be unable to move until July. Ron Thorn

19 had never heard anything about her moving or that she had received a job offer. It would have been

20 highly unusual for her to have received a job offer, because to his knowledge factory job offers

21 were not made to someone who worked out of the area.

22

23 27. In May 2021, Peters wrote to Plaintiff, "You're my best friend. But I also feel for you

24 romantically."  While they had communicated electronically, they had not yet met in person. Thorn

25 had mentioned friendship, but he had never brought up romance. She also said that she had no

26 intention of moving to California because she doesn't want to leave her uncle. She talked about him

27 constantly about her physical affection for him.

28

COMPLAINT FOR PUNITIVE DAMAGES

28. There was no further talk at that time (May 2021) about her working for Fender. She didn't want to move away from her uncle.  Plaintiff does not recall any further discussion about status on the job application. Peters never asked Thorn to "check on the status" or anything of the like. He assumed she didn't want to leave her uncle in Michigan, so that ended her working for Fender. There continued to be "Fender is Hiring" posts made by Master Builders and Fender's own multiple Social Media platforms through all of 2021 and into 2022.

29. In or about May or June 2021, Peters transformed the nature of the communication by sending overtly sexual material to Plaintiff unsolicited. Amanda sent video with her naked from the waist up adorned with a leather dog collar about her neck attached to a dog leash. This was not the only erotic communication which Peters sent. While most of the communication at this point continued to entail discussion concerning guitars, amplifiers, and musicians, explicit erotic communication (i.e., "sexting") was also sent by Peters; All of it was unsolicited by Plaintiff.

30. On or about July 9, 2021, Amanda disclosed to Plaintiff that she suffers from Borderline Personality Disorder. This disclosure was made in the context of Peters having sent a particularly provocative image of herself to Plaintiff. Plaintiff made a jocular comment in response. Peters responded with anger. Peters then requested the opportunity to speak to Thorn over the telephone. In response to her request, Thorn provided her his telephone number. This was their first conversation over the phone. It was during this conversation that she confided in him the knowledge of her psychiatric, issues, and diagnosis. At the time, Plaintiff was unaware of what such a diagnosis meant. In 2022, The National Institute of Health set out the criteria for such a diagnosis as follows:

31. "A pervasive pattern of instability of interpersonal relationships, of self-image, and affects as well as marked impulsivity beginning by early adulthood and present in a variety of contexts as indicated by five or more of the following: 1. Frantic efforts to avoid real or imagined abandonment. Note: Do not include suicidal or self-mutilating behavior covered in criterion 5.

1. A pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation.

2. Identity disturbance: Markedly and persistently unstable self-image or sense of self.

3. Impulsivity in at least two areas that are potentially self-damaging, for example, spending, substance abuse, reckless driving, sex, binge eating, etc. Note: Do not include suicidal or self-mutilating behavior covered in criterion 5.

4. Affective instability is caused by a marked reactivity of mood, for example, intense episodic dysphoria, anxiety, or irritability, usually lasting a few hours and rarely more than a few days.

5. Chronic feelings of emptiness.

6. Inappropriate, intense anger, or difficulty controlling anger, for example, frequent displays of temper, constant anger, recurrent physical fights.

7. Transient paranoid ideation or severe dissociative symptoms."

https://www.ncbi.nlm.nih.gov/books/NBK430883/ The Mayo Clinic describes the condition as evidenced by the following elements:

- A strong fear of abandonment. This includes going to extreme measures so you're not separated or rejected, even if these fears are made up.
- A pattern of unstable, intense relationships, such as believing someone is perfect one moment and then suddenly believing the person doesn't care enough or is cruel.
- Quick changes in how you see yourself. This includes shifting goals and values, as well as seeing yourself as bad or as if you don't exist.
- Periods of stress-related paranoia and loss of contact with reality. These periods can last from a few minutes to a few hours.
- Impulsive and risky behavior, such as gambling, dangerous driving, unsafe sex, spending sprees, binge eating, drug misuse, or sabotaging success by suddenly quitting a good job or ending a positive relationship.
- Threats of suicide or self-injury, often in response to fears of separation or rejection.
- Wide mood swings that last from a few hours to a few days. These mood swings can include periods of being very happy, irritable or anxious, or feeling shame.
- Ongoing feelings of emptiness.
- Inappropriate, strong anger, such as losing your temper often, being sarcastic or bitter, or physically fighting

Had he any understanding of how this psychiatric condition would have affected his life and would have demonstrated itself in her conduct, he would have immediately cut off all communication with Peters.

32. According to telephone records, the conversation on this particular date with Peters lasted for 17 minutes. During the conversation, Thorn apologized for having done anything which offended Peters. Peters responded by apologizing for her strong emotional outburst. Thorn asked her if she was seeking appropriate medical help. Peters responded that she does in fact see a therapist over the

issue. At the time, Thorn believed that he merely needed to be careful about the words that he used

with Peters. He did not realize that a person diagnosed with Borderline Personality Disorder meant

that the person occupied a borderline with psychosis:

> Psychotic symptoms in BPD have been usually described as short-lived, less severe, and qualitatively different from those in psychotic disorders such as schizophrenia, despite the historical inclusion of "borderline" in psychotic disorders. The terms "quasi-psychotic" (limited, brief, and non-bizarre), "transient", "atypical", "pseudo-", or even "factitious" have been often used. However, recent research shows that psychotic symptoms in people with BPD (auditory verbal hallucinations in particular) show more similarities with psychotic disorders than differences. Psychotic symptoms in BPD are also markers of more severe psychopathology and worse prognosis (specifically more frequent hospitalizations and suicidality)

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9005124/ Indeed, it has become apparent that one

possible explanation for Peters' slanderous conduct toward Thorn, as set forth herein, was her anger

at fear of rejection (cf., diagnostic criteria, hereinabove). As will be explained at greater length,

Peters' anger toward Thorn appears to stem from his rejection of her following her unexpected

conduct. Harvard Medical School writes:

> When stressed, people with borderline personality disorder may develop psychotic-like symptoms. They experience a distortion of their perceptions or beliefs rather than a distinct break with reality. Especially in close relationships, they tend to misinterpret or amplify what other people feel about them. For example, they may assume a friend or family member is having extremely hateful feelings toward them, when the person may be only mildly annoyed or angry.
>
> People with borderline personality disorder have a deep fear of abandonment. They compete for social acceptance, are terrified of rejection and often feel lonely even in the context of an intimate relationship. Therefore, it is more difficult for them to manage the normal ups and downs of a romantic partnership. Impulsive, self-destructive behavior may be an attempt to ward off rising anxiety related to the fear of being left alone.
>
> The flip side of the fear is the hope that a relationship will be completely soothing. People with this disorder may idealize a family member, romantic partner or friend, and then become enraged when an inevitable disappointment occurs. They might hold that person responsible for the pain they feel and devalue the relationship.

https://www.health.harvard.edu/a_to_z/borderline-personality-disorder-a-to-z The fear of rejection

or loss of another easily turns over into false statements about the one they believed caused their

emotional pain:

> Though it's not a specific symptom of Borderline Personality Disorder (BPD), it's not uncommon for people with BPD to lie compulsively. If you are related to someone with BPD, you might be concerned by the tendency of your loved one to lie and wonder how to cope.

COMPLAINT FOR PUNITIVE DAMAGES

What you should initially be aware of is that people with BPD don't lie intentionally or with the intent of hurting anyone. "People with BPD lie often, but it is not because they are pathological liars," says Nikki Instone, Ph.D. "Lying is not a symptom of the disorder so much as a consequence of their internal battle."

Lying is really rooted in emotional dysregulation, which is one of the main symptoms of Borderline Personality Disorder.

"One of the key symptoms of Borderline Personality Disorder is a tendency toward highly impulsive behavior. Lying is a characteristic often linked to such emotions, as people with Borderline Personality Disorder are highly sensitive to perceived rejection by others, and therefore they lie to avoid upsetting and alienating those close to them," says Ellen Golding, MFT. "As a result, those suffering with Borderline Personality Disorder tend to do and say things without giving their words any real thought."

Thus, Peters' defaming Plaintiff as set forth herein, could be the result of an inability to even know the truth, or it may be the result of a misperception which has hardened into malice. Whether one or the other, Peters has taken to lying about Thorn.

33. That same telephone conversation included a great deal of self-disclosure between the two. Peters related a story of how some time previously she had been on tour with a rock'n'roll band. She apparently had some sort of relationship with the bass player in the band. One time, while on tour, she had been awake for three straight days as a result of her abusing an illegal drug. After three days of no sleep, she fell into state of unconsciousness. When she awoke, she believed that someone had engaged in an act of sexual intercourse with her. She did nothing further after having made the conclusion of an unwanted sexual event. She did not inform the police. Whether her conclusion was true or an unsubstantiated opinion, Thorn did not know. For his part, Thorn disclosed to her the effects of his having a brain tumor and the effects of the medication he took for his condition. His use of the drug Cabergoline had caused him short term memory loss and anxiety. These side effects continued until his doctor had significantly reduced his dosage. He did not suffer that side effect thereafter. He discussed his strained relationship with his wife. In addition, due to his neurological condition, Thorn's personal sexual history was quite different than Peters had experienced. He had no sexual experiences until well into adulthood, due his inability to do so. By no means was he the stereotype of the "rock n roll" guitar player. He was a diligent craftsman who made musical instruments.

34. This particular conversation had a significant effect upon the manner in which Thorn treated Peters. From thereafter, Thorn was very careful to never initiate any sexual discussion for concern that he might "trigger" Peters.

35. In about November 2021, Peters messaged Thorn of her plan to come to California for a party in honor of the deceased guitarist, Randy Rhoads. Her uncle had taken photographs of Rhoads shortly before his death in 1981. Peters intended to show the photographs to the guitarist's sister. Thorn was unaware of the date or place of the party, but he assumed it would be in Burbank, California, the guitarist's known hometown. In an effort to be courteous, Thorn offered to pick her up from the airport and take her to her hotel. She accepted the offer, and asked whether Thorn could drive her by the childhood home of the guitarist Edward Van Halen. The late Mr. Van Halen had been raised in Pasadena.

36. Peters also informed Thorn that she had obtained some small gifts from a car museum in Detroit. It is no secret that Thorn had an affinity for classic cars. Since this would be the first time that he would see in person the woman who had become quite friendly with him, Thorn selected a guitar pedal from his collection to give to Peters. On his way to the airport to pick her up on December 4, 2021, he also purchased a gift bag.

37. Based upon her arrival time, Thorn had come to the airport at 8:00 AM. He waited at the baggage claim carousel for approximately one hour wondering what had kept Peters. He texted her asking whether she was OK. She finally appeared dressed in a manner that Thorn had not expected from someone who had just made an overnight flight from Michigan and arriving at the airport early Saturday morning. She was dressed in a very short mini skirt. She wore thigh high, high-heeled boots. She was adorned with an excess of makeup. He surmises, that she took so long to pick up her luggage, because she was getting dressed for the meeting. For his part, he was wearing blue jeans and a Dickie work shirt. He recalls that she could barely walk in the boots. She rolled her

1  ankle on multiple occasions while they were walking to the parking structure. Plaintiff was not

2  informed by Peters why she chose to dress provocatively.

3

4  38. Since she was hungry, having been awake all night, they stopped for brunch at a restaurant in

5  Pasadena. After brunch he, true to his word, drove Peters to see Edward Van Halen's nearby

6  childhood home. It was Peters, who had researched the address for the house. It was impossible to

7  see anything of the house, since it was surrounded by a six-foot fence. However, she was quite

8  excited to see even the roof of the guitar player's home. It was still too early to check into her hotel

9  in Arcadia. So, Thorn asked if she would like to take a quick look at the Custom Shop for Fender.

10  After a quick look at the shop, it would be time to check into her hotel.

11

12  39. Fender had been on COVID lockdown since March 2020. As a general matter, no persons were

13  allowed into the facility except for artists, and vendors who had obtained the permission of the plant

14  manager. It was necessary also for there to be a COVID test performed by the on-staff nurse. Even

15  job interviews were not conducted inside of the plant. Employees were subjected to stringent

16  requirements. For example, if an employee had been out of state or away from the plant for more

17  than seven days, they were required to test again before being permitted into the facility. Masks

18  were mandatory at all times inside the building.

19

20  40. However, it was a Saturday morning, it would be unlikely that there would be anyone else in the

21  facility, with the possible exception of scattered maintenance personnel or someone receiving an

22  order. The Custom Shop was a separate part of the facility and would be empty on Saturday

23  morning. Under those circumstances, Thorn concluded that he would not put anyone at Fender in

24  risk by permitting Peters to quickly tour the Custom Shop.

25

26  41. Shortly after parking at the Fender facility, a worker from the shipping department named Fred

27  Connor saw them. Thorn asked Peters if she had any other shoe wear which she could put on

28  instead of high heeled boots. In addition to the fact that her boots were quite out of place for a

COMPLAINT FOR PUNITIVE DAMAGES

Saturday morning at the factory, he did not want her to roll her ankle yet again, this time on company property. She told him that she had other shoes in her luggage. Thorn went around to the back of his car and opened the trunk. When he opened her luggage, he found immediately on top her lingerie. Embarrassed, Thorn said he apologized for seeing that. Peters responded, "It's OK, you can look at my bras and panties." She changed her shoes, and they entered the building. When they reached the Custom Shop, Thorn pointed to a sign on the door which read, "No Photography/No Video." This Fender policy was put in place a few years previously because a visitor posted photographs of unreleased Acoustasonic guitar models. That particular social media post went "viral." Those social media posts interfered with Fenders planned official release announcement.

42. Inside the shop, Thorn walked her around the workspaces for the various Master Builders. When they came to the workplace for Master Builder Paul Weller, She became very excited to see the Lego guitar model hanging on the wall. Since the guitar had been introduced at a trade show years earlier, and there were already pictures of it online, Thorn took it down from the wall and held it in a position so that Peters could take a photograph. She walked ahead to the workstation for Jason Smith. Unknown to Thorn, at the time, she photographed a guitar which was hanging there.

43. They left soon thereafter. On their way back, to Arcadia, Thorn recognized the area around her hotel. He recalled that a Blues club was in the neighborhood and that on Saturday evening Blues would be played. Thorn had been to the club himself on previous occasions. Since Peters had expressed her love of Blues music, Thorn asked if she would like to see the club later that evening. She said, yes.

44. When they came to the hotel, they permitted the valet to park the car. Peters went inside directly. Thorn retrieved her bag from the trunk and followed her shortly thereafter. When they made it to the room, Thorn sat in a chair. He had worked until quite late the evening before and had to wake up early to meet her at LAX for an 8:00 AM arrival. Not surprisingly, (Fully dressed, with

his shoes still on) Thorn fell asleep in the comfortable chair. Peters admitted this in a text to Maria Serrano.

45. When he awoke, Peters was sitting on the bed, close to him on the chair. She commenced physical sexual activity, to put the matter in more polite language. Such is not wholly unexpected with a person who suffers from borderline personality disorder, "Impulsive and sexual behavior with an uncommitted partner were higher in the BPD group and explained by derealization, while conversion showed an inverse association." (Mazinan, R.G., Dudek, C., Warkentin, H. *et al.* Borderline personality disorder and sexuality: causes and consequences of dissociative symptoms. (https://doi.org/10.1186/s40479-024-00251-6) Thorn was unaware of the consequences of Peters' psychiatric condition. He had tried to be kind and friendly. Had he understood, he would not have permitted any intimate correspondence or relation with Peters. However, Thorn was ignorant of the true, full nature of her condition at that time. And he was attracted to her sexual advance.

46. At first, they kissed. She then lifted Thorn's shirt over his head. After she took off his shirt, she noticed he had a Cragar Wheels belt buckle. Curiously, she said that her uncle doesn't like Cragar Wheels. Why she mentioned her uncle in the midst of an intimate, sexual situation, is unknown. This was not the only time she had mentioned her uncle when Thorn had not raised the topic.

47. The physical contact became more intimate. Peters began to "guide" Thorn's hands to the space between her legs, assisting and telling him what she would like. She then began to demonstrate digital penetration on herself. While engaged in this demonstration, she then urinated on herself and on the bed. Thorn was completely surprised. He had never experienced such conduct before. And he was unaware of how to respond. The sight of her conduct and the smell of the urine were repulsive to him. Peters responded in quite a different manner. She began to giggle when she realized Thorn was confused and taken aback by her behavior.

COMPLAINT FOR PUNITIVE DAMAGES

48. Peters then told Thorn that she was a "sub." He had no idea what she meant. He later learned that she meant she was a "submissive" in sadomasochistic behavior. She explained that she had chosen that particular hotel room, having reviewed the room online, because the wall had spaces upon which to affix handcuffs. She had also brought handcuffs with her to be used, presumably by willing participant. This was all behavior which Thorn had not expected. Her seduction, sexual aggressive, urination, discussion of being a "sub" were things Thorn simply did not anticipate.

49. Thorn immediately stopped any further engagement along these lines. Nervously, he apologized to her on numerous occasions and began to get dressed. Peters was surprised by his response. She tried to assure him. She stated that she "would not make him do anything he didn't want to do." Still nervous, he completed dressing himself and thanked her for understanding.

50. Thorn felt relieved and embarrassed. Peters got up and went into the other room to clean up. Thorn removed the soiled bed sheets. After she was dressed, they left the hotel and got to dinner. After dinner, then took her back to the hotel. They talked briefly in the parking lot. She asked him to come back and spend the next day with her. He told her he was very busy, but perhaps could stop by in the late afternoon. They could then get something to eat. She gave him her spare hotel room.

51. He stopped by her hotel late morning the next day. He used the hotel key to get up the elevator. He did not use the key to enter the room immediately. He knocked on the door to announce himself. Having announced himself, he carefully opened the door and found her awake and getting ready. He asked her if she would like coffee. She said yes. He went to the lobby got her coffee and returned to the room. They did not talk about what had taken place the evening before. They left together for lunch. In her text with Serrano, Peters made another false accusation about Thorn alleging he was extremely racist with the waiter.  Much like the false accusations of wrongful sexual conduct, an accusation of racism would be damaging to the business reputation of Plaintiff. To be a racist would make one unable to work in business of designing guitars. That did not happen. The false accusation

was damaging to Thorn's business reputation.  Thorn is not racist, nor would racism be tolerated at Fender.

52. After lunch, they returned to the hotel. At the hotel, she presented the gift she had brought to him from Michigan. A rare set of uncut Ford Mustang keys from the 1960s. Peters had not finished preparing for the Randy Rhoads party, which is the reason she had come to Los Angeles. Thorn had work to do and left her at the hotel.

53. In her texts to Maria Serrano, Peters claimed that on that Sunday morning after breakfast, Thorn came up her to room and made a violent sexual assault on her. She was covered in blood and he, having violently digitally penetrated her, left. This was false and defamatory. Thorn at no time every made a sexual assault upon Peters. She had instituted the brief sexual encounter which Thorn broke off. It was shortly after this alleged violent attack that she attended the party for Randy Rhoads. She had earlier had breakfast with Thorn.  She was visibly comfortable around Thorn at Breakfast.

54. The next day was Monday, December 6, 2021, midmorning, Thorn was busy working at Fender. Master Builder Jason Smith approached Thorn and said, "Amanda is coming to visit right now?" Thorn responded, "What? Why is she coming?" Jason Smith responded, she said she's coming to see us, and that she was here yesterday, too. Thorn responded, "She was here yesterday? I brought her here on <u>Saturday</u> for a quick tour. Who brought her here yesterday?" Jason Smith said, "She sent me a picture of a guitar hanging in my cubicle." How she had a photograph of a guitar at Jason Smith's workstation, Plaintiff could not know. In a text to Serrano a luthier in Spain who Peters identified from Thorn's list of friends from Instagram, Peters admitted that she was friends with other Master Builders at Fender.

55. Thorn texted Peters, asking her if she had received permission to come into the Fender facility during regular business hours. He told her that she would not have access unless she had previously

been granted permission. Peter said she didn't know that. Thorn told her if she would like, she would have to meet people in the parking lot. Meetings in the parking lot were common as a result of the COVID policies at Fender.

56. Sometime later, Jason Smith came up to Thorn and told them that Peters was outside. From this, Thorn could tell that Peters and Smith were in friendly contact with one another. After Thorn completed his work, he went outside to see her. When he came outside, he found Jason Smith, Master Builder Dave Nichols, and a Fender employee from the Amp department named Rob Pierce, along with Peters. After that, Fender employee Javier Cuba joined the group. It seemed that Peters was in friendly contact with all of these Fender employees at the time. She claimed that Mr. Cuba made her a job offer. This was new information to Thorn.

57. Thorn greeted Peters when he came out. He gave her a friendly hug. She laughed at him for wearing an optic-visor. She said, "What's that on your head?" It is a device that he wears almost continually while at work at Fender, and it is so common that he does not notice that he is wearing it on most occasions. In a text with Serrano, Peters claimed that Thorn became "violent" with everyone in the parking lot. This is again another false and defamatory statement she made about Thorn. Such blatantly false "memories" are either the result of her psychiatric condition or an instance of purposefully lying to injure Thorn for not reciprocating her belief that he was her "best friend" and resisting her "romantic" overtures.

58. The conversation among the group was brief and light. They spent no more than 15 minutes together. It was the middle of a workday. It seemed that Peters had arranged to spend the day with Rob Pierce. After goodbye was said, Pierce walked away with Peters. Sometime later, on April 27, 2022, Rob Pierce posted on Facebook, "Gonna see my girlfriend Amanda, Detroit, Michigan." It was posted from John Wayne airport to Detroit.

59. On Tuesday, December 7, 2021, Peters called Thorn to tell him about the Rhoads party. She told them that Ozzy Osbourne was a no show for the party. There was lots of Randy Rhoads memorabilia, and Randy Rhoads' sister was happy to meet her. Peters reported that she had a great time, and she was going to return home to Michigan. Thorn asked her how she was going to get back to the airport. Peters told him that Rob Pierce was going to take her to the airport.

60. Peters texted Thorn later that day to tell him that she was crying. He was not certain why she was so upset. Thinking he must have done something wrong, he apologized to her. He tried to console her to help her feel better. Hours later, she called him from Michigan to tell him that she had made it home safely. The phone records show that on December 8, 2021, Thorn called Peters. They had an 82 minute telephone call.

61. Shortly thereafter, Peters posted a photograph of the Brian May guitar pedal that Thorn had given to her, next to it was Edward Van Halen guitar pedal she already owned. She dubbed the post "Star Fleet." "Star Fleet" was the name of a song that Brian May and Edward Van Halen had collaborated on decades earlier. The video which accompanied the song, had been a subject that Thorn and Peters had laughed about previously. Thorn "liked" her photograph.

62. Throughout the remainder of December 2021, the communication was minimal. There was no particular conflict between the two. Thorn became quite busy at this time. First, he was completing work on his "Prestige" guitar for Fender. Every year, Fender has its master builders design and craft a special one-of-a-kind guitar. In 2021, Thorn had been working on the Hawaiian Dream Resonator, which was eventually sold to Thomann Music, Germany. Photographs of that guitar may be found here:        https://www.Fendercustomshop.com/series/prestige/2022-ron-Thorn-masterbuilt-prestige-hawaiian-dream-resonator-nos/

63. At the same time, Thorn's mother was quite ill. She was hospitalized in a difficult health circumstance. The pressures of the holiday, the demands of work, and his mother's ill health, put

Thorn under tremendous stress. He cut off all communication and contact, other than such things as were immediately necessary. Needless to say, communication with Peters dropped off significantly also.

64. Peters told Serrano by text that on December 22 she was hospitalized for one month due to her "PTSD." According, to Peters, the events which took place in January happened while she was hospitalized.  He was unaware of her hospitalization.

65. In January 2022, Peters messaged Thorn asking him which particular vintage Shelby Mustang did he prefer, "The Green Hornet" or "Little Red." He had no idea why she asked the question. Sometime later he discovered that Peters had contacted fellow Master Builder Dave Nichols and asked Nichols which one of the two shall be Mustangs she believed Thorn would like better.

66. On January 5, 2022, Peters ordered a limited edition REC watch from Denmark, which used a piece from an original Shelby green Hornet Mustang as the dial face. Peters did not tell Thorn what she was doing. She did message Thorn to let him know a gift would be arriving for him. On January 11, 2022, confirmation was sent to Peters that the watch had cleared customs and would be delivered to Thorn's PO Box.

67. Peters began to message Thorn, asking him to go to his PO Box. He can only go to the PO Box during work hours. Since that is inconvenient for him, he was unable to get whatever unknown thing she had sent to him. His concern was his mother's condition. That, and work, kept him from retrieving the unknown mail. She became unhappy that he did not immediately prioritize her mail.

68. He retrieved the gift on January 19, 2022. The receipt for the gift was in the package. When he discovered that Peters had spent $1700 on the gift, he was very surprised. He found the gift extremely expensive. It was the most expensive gift he had ever received from anyone, and it seemed to be something far too expensive for Peters to afford to give. Upon receiving the gift, he

called Peters and told her that he felt very uncomfortable accepting such an expensive gift. Knowing that she did not have a full time job, he offered to reimburse her for the gift. What Thorn did not realize was that such behavior (her unexpected sexual advance followed an impulsive purchase of an expensive gift) are behaviors consistent with BPD:

> If this is the case, you will have been left with very high levels of distress without skills of how to deal with this distress other than engaging in impulsive behaviors that might make you feel better briefly but have long-term negative consequences. Examples of such impulsive behaviors might include verbal or physical attacks, self-harm, alcohol, and other substance use, sex you later regretted, disordered eating, and *excessive spending*.

(Krawitz, R., & Jackson, W. (2023). *Borderline personality disorder*. Oxford University Press [emphasis added].)  She was offended at his offer to reimburse her, which is also consistent with the diagnosis and fear of abandonment (a fear created from her own creation of a committed relationship). Expensive gifts are tokens of deep romantic affection. Paying some "back" for a gift is a way to politely refuse the product *as a gift*. Hence, she would experience his kindness as rejection, because of her condition. Plaintiff was at all times unaware of the symptomology of BPD.

69. Her responsive was both extreme and disproportionate to the circumstance. Their conversation lasted for 48 minutes. During that time, he attempted to calm her down.

70. He was unsuccessful in getting her to calm down. Over the next two days, she sent him cruel and demanding messages. At that time, his attention was taken by his mother being in and out of the ICU. He was attempting to keep his family up to date about his mother's condition. His sister, who lived in Canada, was not permitted to travel to the United states to visit their mother due to COVID restrictions. Peters did not take well to so obviously not being the most important thing in Thorn's life.

71. During the same time period, the relationship between Thorn and his wife began to improve. When he told Peters that the relationship with his wife was improving, Peters again became exceptionally irate. He later discovered that Peters had heard about the reconciliation between Thorn and his wife through other Fender employees.

72. In response to what Peters apparently perceived as a rejection, and consistent with her diagnosis, Peters took action. "Some patients with BPD under stress develop paranoid symptoms when they may have ideas of reference, display magical thinking and become suspicious of others. These may be termed mini psychotic episodes and are most likely to occur in the context of some interpersonal crisis that has made the patient feel that they have been abandoned." (Bateman, A., & Fonagy, P. (2004). Psychotherapy for borderline personality disorder:

> Mentalization-based treatment. Oxford University Press.) As one writer explained, "Punishment and revenge are central to the manifestation of what Borderline Personality Disorder (BPD) is and means when it comes to relationships. The struggle of those with BPD relationally, is rooted in a proverbial no-win situation.
> Borderlines do not know how to cope with intimacy – it leaves them feeling engulfed. Borderline don't know how to cope with healthy distance (the moving in and out between the two) in a relationship either because it triggers feelings of abandonment.
> Either way, what borderlines end up feeling is treated unfairly. Whatever lands in the unfair category in the mind of someone with BPD will be fuel for the fire of punishment and/or revenge.

https://mentalhealthcenter.com/punishment-and-revenge-in-borderline-personality-disorder/#:~:text=Either%20way%2C%20what%20borderlines%20end,in%20cyclical%20and%20patterned%20ways. Character assassination is an expected act of revenge by one with BPD:

> When individuals with symptoms of BPD feel threatened by others, they may lash out by assassinating the character of those they feel threatened by. Character assassination involves repeated demeaning, and in some cases slanderous, statements and accusations, in the presence of others whenever possible.

https://www.psychologytoday.com/us/blog/my-side-of-the-couch/202302/borderline-personality-disorder-and-character assassination:~:text=Why%20Some%20People,%E2%80%BA%20blog%20%E2%80%BA%20borderline%2D...

73. On January 23, 2022, Peters contacted the CEO of Fender, the executive vice president of Fender and the chief talent officer of Fender alleging that Thorn had engaged in predatory behavior, and sexual misconduct at the workplace. Her communication included a threat of blackmail. Thorn was unaware of her communication when it took place. (See, e.g., Cal. Pen. Code § 518)

COMPLAINT FOR PUNITIVE DAMAGES

74. On January 24, 2022, Thorn received a message from Peters demanding to know why he has not been responding to her. In the short walk from the parking lot to the building, he told her that the circumstance involving his mother's illness took his time. She was completely unconcerned about the health or life of his mother and was demanding to know why he was neglecting her.

75. On January 25, 2022, Peters called Thorn's wife. In her effort to increase the injury and pain suffered by Thorn, and in an act of malice, she sent a number of photographs and messages to Thorn's wife, trying to destroy the potential for reconciliation in that relationship.

76. In a text to Serrano, Peters claimed she contacted the police on February 4, 2022. Her explanation of the report reads, "Police asked me what was the problem when they heard what he did for a living" they broke off the investigation. To make such an accusation about the police department is defamatory of the officer who took the report. It is absurd to imply the Police would refuse an investigation because Thorn worked for a guitar manufacturer. Perhaps such belief stems from a delusion on the part of Peters.

77. On February 8, 2022, the human resources director for Fender contacted Thorn and asked him about Peters job application. He knew nothing about any job application. He says he vaguely remembers her stating that she was going to apply for a position as a painter. Her insistent "belief" that she had applied, and the application had been rejected is apparently another instance of confabulation and delusion or paranoid ideation.

78. On February 9, 2022, at 7:16 AM, Thorn wrote to the human resources director at Fender concerning the topic raised the day before. He explained to the HR director that Peters had been harassing Thorn, his family, and was making false accusations at the workplace. He understood this to be a result of his decision to reject her sexual advance. He predicted that she would likely in the near future begin a social media slander campaign, as she had done with the bass player in the band she had toured with years before.

COMPLAINT FOR PUNITIVE DAMAGES

79. On February 9, 2022, at 1:56 PM, Thorn sent an e-mail to the Fender HR director explaining that Peters had begun posting with the #metoo hashtag. It seemed to Thorn more obvious that she was angered due to the reconciliation between Thorn and his wife.

80. In response to Fender's social media post, Peters began to respond with accusations of Thorn being a rapist. Fender deleted the post as soon as possible. Various threads began to appear on Reddit, signed with various screen names making claims about Thorn being a rapist. Unfortunately for Thorn, and something he had not expected, making false accusations of a sexual assault in response to a fear of abandonment are not uncommon for someone with BPD:

**Connection Between BPD and False Allegations**
Individuals with BPD may be more prone to making false allegations of sexual assault due to several factors related to the disorder:

- **Fear of Abandonment:** Individuals with BPD may make false allegations as a way to manipulate others or prevent perceived abandonment. This intense fear can drive them to extreme behaviors to secure attention and support.
- **Unstable Relationships:** The instability in personal relationships common in BPD can lead to intense and volatile interactions. False allegations may arise from a desire to retaliate or gain control in these tumultuous relationships.
- **Impulsivity:** BPD's impulsive nature can lead to hasty and ill-considered actions, including making false accusations without fully considering the consequences.
- **Emotional Dysregulation:** The emotional intensity and rapid mood swings associated with BPD can result in distorted perceptions of events and interactions, potentially leading to false allegations.
- **Identity Disturbance:** Individuals with BPD often experience confusion about their identity and self-image, which can contribute to inconsistent and unreliable narratives about personal experiences, including allegations of assault.

**Case Studies and Research**
Several studies have explored the relationship between BPD and false allegations of sexual assault. These studies highlight the complex interplay between the symptoms of BPD and the behavior of making false accusations.
For example, a study published in the Journal of Forensic Sciences examined the characteristics of false allegations of adult crimes and found that individuals with BPD were overrepresented among those who made false accusations. The study suggested that the emotional and relational instability of BPD could contribute to the likelihood of making false claims.

https://ucmjdefense.com/borderline-personality-disorder-and-false-sexual-assault-allegations

81. On February 14, 2022, Peters contacted the human resources department at Fender "to make them aware that Thorn was following underage girls on social media and provide screenshots". The

allegedly underage girls were members of Thorn's family. On February 22, 2022, Thorn's mother passed away after a week in Hospice.  The coupling of Peters' barrage of lies and accusations coming at the time of his mother's death made the matter even more painful for Thorn.

82. Thorn understands then on March 8, 2022, but Peters contacted the CEO of Fender. She was told by Fender that there is no evidence that she had ever been offered a job with Fender.

83. As a result of Peters attacks against Thorn, Fender began to remove images and video of Thorn from Fender's social media accounts. Removing images of Thorn's work had and has an effect upon Thorn's business reputation.  Even though Thorn was innocent of all accusations, Fender felt the need to protect its image from Peters' defamation. Fender's HR director suggested demoting Thorn from his Director position. Some of the master builders began to question Thorn about what they were reading online. He denied all of it, explaining he had never assaulted anyone. Yet, some of the Master Builders began to change their attitude towards Thorn. As is well known, even false accusations repeated often enough will cause injury to one's reputation. Lying for the express purpose of injuring Thorn was the patent purpose of Peters.

84. On July 31, 2022, Thorn received a letter from the Arcadia Police Department asking to contact a detective and to give a statement. Thorn is not alleging that any contact with the police department was defamatory or otherwise actionable. The reference to the police department is for context but does not form part of his allegations of defamation.  Such communications are privileged and do not form the basis for any claim against Peters. The fact of the police report has been added for the sake of clarity of narrative, only.

85.  In September or October 2022, Peters began to contact female followers of Thorn on Instagram. Peters was warning them that Thorn was a predator and a rapist. For example, Peters contacted Susie Cadillac a Colombian professional guitarist. Cadillac refused to accept the accusations being made by Peters. In response, Peters became angry with Cadillac. Peters contacted Sarah

COMPLAINT FOR PUNITIVE DAMAGES

Gallenberger. Peters contacted Maria Serrano. Again, false accusations of sexual assault are an unfortunate but well documented effect of BPD:

> When parsing these domains, it can be more clearly seen how BPD may serve as a pathway for false allegations of sexual assault. The first domain (Leib et al., 2004) includes the diagnostic criterion of quickly switching from idealization to devaluation of relationship (American Psychiatric Association, 2000). The instability of relationships experienced by an individual with BPD may be rooted in the tendency to quickly switch from idealizing significant others or lovers to devaluing them (American Psychiatric Association, 2000).
>
> This sudden change in conceptualization of a partner is often caused by feeling that the partner is not caring enough or giving enough or by suspicion of abandonment. The rapid shifting between idealizing and demonization may bring about a change in perspective such that a relationship that was viewed idealistically in the past is now seen through the devalued lens of abuse or mistreatment. Past events then may become construed as "abuse" and may lead a person with BPD to believe he or she is a victim of sexual assault.
>
> As Kanin (1994) found in his longitudinal study, two of the three major motivations to file a false allegation of rape were attention-seeking and revenge. The switch from idealization to devaluation of the relationship and/or relationship partner (American Psychiatric Association, 2000) may spur a desire for revenge for any past behaviors that are, in the devaluation phase, newly construed as mistreatment. In addition, an individual with BPD who is feeling fear of abandonment may seek frantically to achieve the attention that is craved from the partner who is perceived to be neglectful (American Psychiatric Association, 2000). The impulsive nature of a person with BPD may also lead them to act on these motivations for attention or revenge by filing a false allegation of sexual assault before carefully considering the consequences. Also, there is some evidence that individuals with BPD engage in behaviors that are viewed as "manipulative" (Linehan, 1993).
>
> Manipulative behaviors are often outside the conscious awareness of the individual and are learned through positive reinforcement, as manipulation frequently results in positive outcomes for the manipulator. Thus, an individual with BPD may use a sexual assault allegation as a way of impacting a third party for some desired outcome.
>
> The second domain (Lieb et al., 2004), consisting of symptoms of reality-based delusions and hallucinations, may lead to false beliefs of sexual assault, and clinical experience suggests that sexuality is a common theme in delusions and hallucinations. The DSM-IV-TR (American Psychiatric Association 2000, p. 299) defines delusions as "erroneous beliefs that usually involve misinterpretations of perceptions or experiences." Hallucinations involve sensory experiences that do not appear to be externally caused. Thus, individuals with BPD may represent a "perfect storm" of symptoms in which an impulsive, emotionally dysregulated individual who is demonizing someone and has loose contact with reality and who is attention and revenge makes a false allegation of sexual assault.
>
> However, when considering this pathway, it is important to keep in mind that individuals with BPD are more likely to have experienced sexual or physical assault (Lieb,

et al., 2004) due to the same characteristics of the disorder. Thus, it is important to fairly and adequately weigh the evidence presented in an allegation of sexual assault. Engle, Jessica., O'Donohue, William. Pathways to false allegations of sexual assault. Journal of Forensic Psychology Practice, Vol 12(2), Mar, 2012. pp. 109-111.

Quoted in the declaration of Paul Simpson, EdD. 2292 W. Magee Rd., Suite 220, Tucson, AZ 85741 Arizona Licensed Psychologist, specializing in criminal forensics. ]Listed in the National Register of Psychologists, https://arizonaforensics.com/affidavit-for-borderline-personality-and-false-accusations/

86. Serrano, in particular, began to forward Thorn the messages she was receiving from Peters. Thorn was flabbergasted by how vile and false the accusations she was making were. For example, she kept referring to Thorn "blackmailing" her, but never produced any text which demonstrated such "blackmail." Plaintiff alleges that such conduct is demonstrative of her intentional conduct warranting exemplary damages as alleged below. "BPD and lying often go hand in hand due to intense emotions, fear of abandonment, and impulsivity. Their fear of abandonment often leads them to use lying to influence other people's actions and control how others perceive them." (Degges-White, A. S., Degges-White, S., & Saleh, N. (n.d.). *BPD & lying: Why it happens & how to respond.* ChoosingTherapy.com. https://www.choosingtherapy.com/bpd-and-lying/)

87. The statements made by Peters include statements that are not merely false but are not even plausible. For instance, she wrote, "The police heard who he was and refused to help." This lie does not merely disparage the Defendant Thorn, it also disparages the Arcadia Police Department by accusing them of refusing to investigate a crime based upon the identity of the accused.  Thorn is not alleging it was defamatory or otherwise actionable for Peters to contact the police department. It is untrue on its face, because it is unlikely the person receiving the police report even knew the identity of Mr. Thorn, his identity being known primarily by professional musicians but not members of the public.

88. Peters' rendition of what happened demonstrates a manipulative form of abuse commonly

referred to as "gaslighting". She writes that he was manipulating and exploiting her. To "prove:"

this point, she included a screen shot of a text message exchange with Thorn.

> Peters: It was when you said, you felt like I [Peters] was using you [Thorn]. That hurt.
> Thorn: I'm so sorry
> Peters: I [Peters] felt horrible.
> Thorn: I [Thorn] didn't mean to hurt you [Peters].
> Peters: I [Peters] told you[Thorn] I thought it was mutual.  You [Thorn] agreed.

Rather than Thorn "blackmailing" Peters, it shows Peters manipulating Thorn. She was using his

kindness and compassion as a means to hurt him. This conversation took place after she came to

California. He said to her," It feels to me that you [Peters] used me [Thorn] to get an "in" Fender."

Peters, "Accusing me of using you makes me feel bad." Thorn, "I'm sorry." She is unkind to him,

and then says it makes her feel bad that he was hurt. Such behavior is consistent with the

symptomology of BPD as explained by one commentator, "A pattern of unstable, intense

relationships, such as believing someone is perfect one moment and then suddenly believing the

person doesn't care enough or is cruel."

89. Serrano questioned Peters about her story. Serrano told her the underage females he followed on

Instagram were Thorn's family members. Serrano asked questions concerning the story Peters was

telling her, because the story did not make sense. Peters refused to answer questions and said, "I

don't owe you my case." She refused to answer more. She also claimed to have audio and visual

proof of the alleged attack but refused to show any of this supposed evidence to Serrano.

90. Since this took place while Thorn was at work, Thorn walked over to Jason Smith and told him

that Peters had taken to contacting Thorn's friend in Spain, Maria Serrano. Thorn expressed his

disbelief at what was taking place. He told Smith how her accusations were the exact opposite of

what took place. Less than 5 minutes later, Peters contacted Maria Serrano. It appears that Jason

Smith immediately contacted Peters, because Peters contacted Serrano, making angry accusations

COMPLAINT FOR PUNITIVE DAMAGES

that Serrano had passed along to Thorn the false and slanderous accusations which Peters had made about Thorn.

91. On April 3, 2023, the Fender legal department set up a zoom call with Thorn and explained to him that Rolling Stone magazine had contacted Fender about Peters' accusations about Peters' accusation about Thorn. The instant litigation concerns only information communicated to non-governmental persons. Likewise, the copyright violation concerns communications made outside of privileged activity.

92. This lawsuit does not concern the substance of any complaint, by Peters. The allegations of defamation concern solely the things which Peters has said outside of the litigation procedure. Nothing said in any lawsuit complaint or otherwise in the context of litigation is a basis for this litigation.

93. On or about March 22, 2024, Thorn registered with the copyright office of the United States government the photograph. Attached hereto as exhibits "A" and "B," and incorporated herein by reference, is a true and correct copy of the photograph and copyright registration by Peters in video posted to YouTube. In 2024, Peters made a video which was posted on YouTube. In that video, Peters makes a number of false and defamatory statements concerning Thorn. She also displays the copyrighted, registered photograph of Thorn as alleged herein. In her video presentation, Peters again made a number of false accusations which damaged Thorn in his trade reputation. Such statements were not communicated in the context of litigation. Peters referred to herself as "Doe" plaintiff; she did not admit to her real name, thus her connection to the litigation was not known to one merely watching the video (of course, that also proves that Peters' fear forcing her to bring the lawsuit under a false name is obviously false, when she is willing to make an international broadcast of her name in another forum). The false accusations were not in connection with, nor in furtherance of the litigation. The false accusations were not made to any person having a direct vested interest in the nature of allegation, beyond a curiosity for salacious conduct, those having a

prurient in such content, those who enjoy gossip and slander for its own sake. Her conduct was done merely to cause further damage to Thorn's trade reputation. The defamatory statements have in fact resulted in loss of income to Thorn.

### First Cause of Action

(Copyright Infringement)

94. Plaintiff incorporates by reference the allegations contained in paragraphs 1-93 as though fully set forth here at.

95. On or about January 15, 2024, Peters made a video which was posted on YouTube. In that video, Peters makes a number of false and defamatory statements concerning Thorn. She also displays the copyrighted, registered photograph of Thorn as alleged hereinabove. Defendant Peters reproduced and distributed that photograph without authorization or permission.

96. The above-described conduct by Defendants constitutes willful copyright infringement under the Copyright Act:

(a) Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be....
(b) The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.

17 U.S. Code § 501.

97. As a result of the above-described conduct by Defendants, Plaintiff is entitled to obtain an injunction of this court to prevent further infringement:

Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

17 U.S. Code § 502. In addition, Plaintiff is entitled to recover monetary damages:

Except as otherwise provided by this title, an infringer of copyright is liable for either—

> (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

> (2) statutory damages, as provided by subsection (c).

17 U.S. Code § 504

98. By reason of the copyright infringement described above, Plaintiff is entitled to recover Defendants' profits to the extent the same are not included as part of Plaintiff's damages.

99. In the alternative, at the election of Plaintiff, Plaintiff is entitled to recover from Defendants statutory damages up to $150,000.00 per copyright infringed for Defendants' willful copyright infringement, plus attorneys' fees.

## SECOND CAUSE OF ACTION

### (Trade Libel and Slander)

(Against all Defendants)

100. Plaintiff hereby incorporates by reference all allegations contained in paragraphs 1 through 99 as though fully set forth here at.

101. Plaintiff is informed and believes, and based upon such information and belief alleges that Peters has made communications to a number of persons, the sum total of which is currently unknown to Plaintiff. The parties to whom Peters had made such false and defamatory accusations include persons in the human resources department at Plaintiff's then-employer, Fender, and to third parties both directly and generally over the internet. These communications, as made by Peters, were to claim that Plaintiff had committed a sexual battery upon Peters. Which is untrue. The statements were defamatory in that (1) they accused Plaintiff of criminal activity, and (2) tend directly to injure him in his profession. The statements conveyed by writing were defamatory on their face. He was in fact injured in his trade reputation.

102. As alleged hereinabove, Peters made false statements of fact—often by use of pseudonyms—in various forums concerning Plaintiff. The accusations made by Peters in these online forums were such that they would expose Plaintiff to hatred, contempt, ridicule, and/or obloquy, which cause Plaintiff to be shunned or avoided, and/or have a tendency to injure him and his occupation.

103. The false statements of fact as herein alleged, were made without privilege. The statements were libelous on their face. Such false statements also have the effect of destroying the personal and professional reputation of Plaintiff. Thorn is not alleging that any privileged communications were defamatory. This lawsuit expressly disclaims any privileged communication such as a communication to the police department or the allegations made in the complaint filed by Peters in state court. (*Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696, 703, ["Filing a false criminal complaint is an illegal activity, not a constitutionally protected exercise of the rights of petition or free speech, and that is the end of Alice's anti-SLAPP motion."])

104. Plaintiff at no time committed a sexual battery upon Peters. Any and every statement by Peters outside of the context of the proceedings of the litigation instituted by Peters which claimed or implied that Plaintiff had committed a sexual battery was (and is) false. Such allegations have the effect of destroying the personal and professional reputation of Plaintiff. Thorn is not alleging that any privileged communications were defamatory, and herein explicitly disclaims any claim based upon legally privileged communications.

105. Such statements made by Plaintiff, were made without privilege or justification. The statements, as alleged herein as having been made by Peters, were made without privilege or justification, were false, and, as a direct and proximate result of such unprivileged false statements by Peters, Plaintiff suffered pecuniary loss. Such pecuniary loss includes, but is not limited to, the loss of Plaintiff's employment with Fender Guitar, and the loss of an unknown number of sales of custom guitars made by Plaintiff outside of his employment with Fender. Wherefore, Plaintiff prays

for an award of compensatory damages sufficient to remedy all loss caused by Peters and suffered by Plaintiff.

106. Plaintiff is informed and believes, and based upon such information and belief, alleges that in making the false and defamatory statements as alleged herein, Peters acted with malice, fraud and oppression with the intention of destroying Plaintiff's personal and professional reputation, causing Plaintiff to suffer economic distress, and to destroy Plaintiff's personal and professional relationships. Accordingly, Plaintiff prays for this Court to award exemplary damages against Peters and in favor of Plaintiff.

**WHEREFORE, PLAINTIFF PRAYS AS FOLLOWS:**

On the first cause of action:

1. Wherefore, Plaintiff prays for an award of compensatory damages sufficient to remedy all loss caused by Peters and suffered by Plaintiff, and/or statutory damages and attorneys' fees such as provided by law.

2. For punitive damages.

On the second cause of action:

1. Wherefore, Plaintiff prays for an award of compensatory damages sufficient to remedy all loss caused by Peters and suffered by Plaintiff, but in any event no less than $5,000,000.

2. For punitive damages.

///

///

///

COMPLAINT FOR PUNITIVE DAMAGES

On all causes of action

1. For costs of suit herein.

2. For such other and further relief as the court deems just and reasonable.

Dated October 11, 2024

Respectfully submitted,
LAW OFFICES OF MICHAEL S. OVERING, APC


Michael S. Overing, Esq.
Edward C. Wilde, Esq.
Itzel Morales, Esq.
Tiffany R. Gutierrez, Esq.
*Attorneys for Defendant, Ron Thorn*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

COMPLAINT FOR PUNITIVE DAMAGES



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

# EXHIBIT B

21
22
23
24
25
26
27
28

COMPLAINT FOR PUNITIVE DAMAGES

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## VAu 1-522-324

**Effective Date of Registration:**
March 22, 2024
**Registration Decision Date:**
March 27, 2024

---

## Title

**Title of Work:** RonThorn1

## Completion/Publication

**Year of Completion:** 2021

## Author

- **Author:** Ronald Thorn
  **Author Created:** photograph
  **Citizen of:** Canada
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Ronald Thorn
2464 BENT SPUR DR., Acton, CA, 93510, United States

## Rights and Permissions

**Name:** Ronald Thorn
**Email:** thorninjay@gmail.com
**Telephone:** (818)523-4532
**Address:** 2464 BENT SPUR DR.
Acton, CA 93510 United States

## Certification

**Name:** Ronald Thorn
**Date:** March 22, 2024

Page 1 of 2



**Registration #:**   VAu001522324
**Service Request #:**   1-13647289051

Ronald Thorn
2464 BENT SPUR DR.
Acton, CA 93510 United States

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT C

COMPLAINT FOR PUNITIVE DAMAGES

AP

# AMANDA PETERS

ampeters1014@gmail.com   |   734-892-7329   |   Pinckney, MI 48169

## Summary

New Painter with experience operating compressors, blasting equipment and both airless and conventional spray guns. Familiar in finishes such as sparkle, bursts, touchup's and custom acrylic and enamel artwork while adhering to deadlines and product quality.

## Skills

- Maintenance and repair
- Design and Painting techniques
- Multi Lingual
- Issue and conflict resolution
- Deadline-driven

## Experience

**Self Employed | Ann Arbor, MI**
**Technician-in-Training**
*04/2020 - 04/2021*

- Inspected and repaired components and electrical set ups within guitars, basses, pedals and mixers both modern and Vintage ranging from 1970s morley wah's to an all original 1960 Ampex Mixer all while studying components and vintage PCB setups.
- Installed new pickups, pcb boards, and pre amps into my own personal guitars as well as slect clients.
- Composed descriptions of merchandise for posting to online storefronts, auction sites and other shopping Web sites while maintaining high feedback ratings from customers by responding quickly to questions and problems.

**Alleva Coppolo | Upland, California**
**Painter**
*03/2020 - 04/2020*

- Readied surfaces and surrounding areas for painting using sandpaper, tape and other materials.
- Prepared bodies and necks for painting.
- Operated spray equipment within a controlled booth
- Mixed paints and solutions and monitored consistencies.
- Collaborated with two other team members to meet strict project completion deadlines.
- Smoothed and finished surfaces using both sanding and buffing techniques
- Worked with water slide decals on both necks and bodies
- Painted bodies and necks with both color and clear coats in solid colors, bursts, metallic finishes, sparkle finishes and a candy coat.

**Miss Kim's | Ann Arbor, MI**
**Expeditor**
*07/2018 - 03/2020*

- Assessed current inventories and brought in supplies to keep stock within optimal levels for expected demands.
- Collaborated with management, sales and engineering to adjust plans and maintain targets.
- Resolved complaints and eliminated delays by collaborating with vendors

and updating strategies.

- Purchased goods to maintain stock and prepare for assembly
- Confirmed guest satisfaction by monitoring company time and quality standards for each meal.
- Adhered to corporate standards and policies in overseeing restaurant operations.
- Provided mentorship and guidance to new kitchen team members.
- Coordinated service for food runners and other kitchen staff.
- Illustrated knowledge of menu and service offerings to educate guests.
- Performed routine office tasks, including copying, answering telephones, file management and data entry to keep operations at optimal levels and better serve internal and external customers.
- Reviewed production orders, schedules, delivery dates and inventory levels to determine product availability.
- Trained newly hired top talent to fill key positions and maximize productivity.
- Tested trainees on materials to determine levels of understanding and areas requiring further instruction.
- Documented participant attendance, engagement and progress.
- Collaborated with staff to maximize customer satisfaction, streamline procedures and improve bottom-line profitability.
- Conducted inventory counts by assessing current state of inventory integrity against target accuracy levels and tracking variances.
- Trained employees on additional job positions to maintain coverage of roles at all times.
- Cross-trained in every store role to maximize operational knowledge.
- Interacted with prospects and customers at various events, including trade shows, seminars and workshops.
- Completed thorough opening, closing and shift change functions to maintain operational standards each day.
- Forecasted trends in expected business levels and adjusted labor and inventory to match expectations.

Whole Foods Market | Ann Arbor, MI
**Clerk**
*02/2017 - 07/2018*

- Cross-trained in other kitchen positions to support team and meet customer needs.
- Conducted inventory counts by assessing current state of inventory integrity against target accuracy levels and tracking variances.
- Trained employees on additional job positions to maintain coverage of roles at all times.

Sweetwaters Cafe | Ann Arbor, Michigan
**Chalk Board Artist**
*02/2017 - 02/2018*

- Created series of rough sketches for review, revision and approval.
- Incorporated chalk and chalk markers to create custom paintings and murals to drive business sales and target marketing strategies
- Consistently met schedules and deadlines for all illustration projects.

Lucky's Market | Ann Arbor, MI
**Lead Graphic Designer**
*07/2015 - 12/2016*

- Submitted design ideas to plan projects with customers and managers.
- Leveraged proficiency in Adobe InDesign, Photoshop and Illustrator to design email blasts, catalogs, posters and other promotional materials.
- Oversaw product design, print design and marketing collateral from concept to completion.
- Developed, designed, laid out and produced variety of technical illustrations for brochures, banners and signs as well as hand drawn chalk board art

- Collaborated with creative design team to complete projects on tight deadlines.
- Maintained accurate specs, adhering to print and art specification standards.
- Managed inventory and maintained supply of equipment and materials.

## Education and Training

Washtenaw Community College | Ann Arbor, MI
**Associate of Arts** in Graphic Design
*05/2014*